**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

J.A., an individual,

Plaintiff,

v.

G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
SHRI HARI RALEIGH LLC
d/b/a MOTEL 6 RALEIGH,

Defendants.

Civil Action No.: _______________

JURY TRIAL DEMANDED

**PLAINTIFF'S COMPLAINT**

COMES NOW Plaintiff J.A., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This action for damages is brought by J.A. ("Plaintiff"), a survivor of sex trafficking, under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud and coercion by her trafficker to have sex with sex buyers at Defendants' subject hotel, located at 2641 Appliance Court, Raleigh, NC 27604, in 2017.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. will collectively be referred to as "G6," "G6 Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 located in Raleigh, North Carolina (the "Subject Hotel").

4. Shri Hari Raleigh LLC is herein referred to as the "Franchisee Defendant." Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Motel 6 Raleigh located in Raleigh, North Carolina through the G6 franchising system.

5. Section 1591 of the TVPRA criminalizes sex trafficking of adults by force, fraud or coercion. See 18 U.S.C. § 1591. Separately, § 1595 of the TVPRA provides individuals who are victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. § 1595(a). More specifically, § 1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1) — a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2) — a criminal statute; and (3) a beneficiary claim against a civil defendant who did not violate § 1591, but who "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a); the subject lawsuit is applicable, in part, to prong three, i.e. a beneficiary claim against civil defendants.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff's name and address are not contained in this Complaint to protect the safety,

privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff J.A. is a resident of Michigan.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

14. Defendant Shri Hari Raleigh LLC is a for-profit limited liability company. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Motel 6 Raleigh located at 2641 Appliance Court, Raleigh, NC 27604 through the G6 franchising system.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Eastern District of Texas, and all G6 Defendants are residents of Texas.

17. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Therefore, each is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

18. Under 28 U.S.C. § 1391(c)(2), Franchisee Defendant is a resident of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee Defendant.

19. Under 28 U.S.C. § 1391(d), Franchisee Defendant is a resident of Texas for the purpose of § 1391(b)(1) because if the Eastern District of Texas were a separate state, Franchisee Defendant's contacts with the district would be sufficient to subject it to personal jurisdiction.

20. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

21. Plaintiff's claims against Franchisee Defendant arise out of Franchisee Defendant's contacts with Texas through Franchisee Defendant's relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas.

22. Franchisee Defendant's participation in a venture with the G6 Defendants operating the subject motel occurred, in substantial part, in Texas because: (a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas; (b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern

District of Texas; (c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas; (d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law; (e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like J.A.; (f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas; (g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas; (h) the G6 Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the Eastern District of Texas; (i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas; (j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants); (k) upon information and belief, both reservation and payment information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas; (l) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement; (m) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas; (n) on information and belief, Franchisee Defendant signed a software licensing

agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and (o) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### *I. J.A. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.*

23. In 2017, Plaintiff J.A. was trafficked at the Subject Hotel by her male trafficker. Under the control of her trafficker, J.A. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

24. In order to induce J.A. by force, fraud, and coercion to engage in sex with sex buyers at Defendants' hotel, her trafficker used various means including: (a) supplying, administering, and controlling J.A.'s access to heroin, a highly addictive controlled substance, in order to induce and maintain her chemical dependency on heroin; (b) withholding heroin as a means of coercion, exploiting the severe physical and psychological effects of opioid withdrawal in order to compel J.A. to engage in commercial sex acts on demand; (c) verbal abuse, including threats, intimidation, and demeaning treatment; (d) physical abuse of J.A.; (e) psychological coercion through the manipulation of J.A.'s chemical dependency and through her isolation from outside sources of support; (f) instilling in J.A. the fear of withdrawal, physical harm, and abandonment if the trafficker's directives were not complied with; and (g) other means of force,

fraud, and coercion used by the trafficker to induce J.A. to have sex with sex buyers at the Subject Hotel.

25. J.A.'s trafficker advertised her for commercial sex through online platforms including SkipTheGames and Megapersonal.

26. Upon information and belief, J.A. was not the only female trafficking victim exploited at the Subject Hotel during the relevant period. Other female sex trafficking victims were trafficked at the Subject Hotel at times, further indicating that the Subject Hotel was being used as a known venue for commercial sex trafficking activity of which Defendants' staff and management knew, or should have known, in the course and scope of their employment.

27. Rooms rented at the subject hotel for use in trafficking the Plaintiff were rented by the trafficker or at the direction of the trafficker.

28. J.A.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on J.A.'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that J.A. was being continually subjected to coercion, control, and exploitation.

### *II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.*

29. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of J.A.

30. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

31. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

32. Some of the recommended policies and procedures, of which Defendants are or should be aware, include training staff to identify the warning signs of sex trafficking — among them fear, coercion, or confinement; signs of physical abuse, malnourishment, poor hygiene, or impairment; lack of freedom of movement or of control over money or identification; and the presence of drugs, bulk condoms, multiple cell phones, or large amounts of cash.

33. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

34. The relationship between a trafficker and a person in prostitution is inherently coercive, and the United States Department of Justice and other authorities recognize that most individuals in prostitution are subject to force, fraud, or coercion. Because commercial sex and sex trafficking are closely associated in a hotel environment, Defendants knew or should have known that signs of commercial sex activity at their hotels were signs of sex trafficking.

35. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and

enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

36. The hospitality industry is uniquely positioned to identify and report human trafficking, and trained employees are more likely to recognize and report it; a company that does nothing to prevent trafficking risks becoming a conduit for it.

37. Given the prevalence of trafficking in hotels and the information available on how to identify and prevent it, a hotel chain that continues to generate revenue from traffickers without taking reasonable preventive steps chooses to profit from trafficking rather than to prevent it.

38. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

***III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.***

39. Defendants' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has known, since well before J.A.'s trafficking, that sex trafficking was ongoing at Motel 6 properties including the Subject Hotel.

40. G6 branded properties include both Motel 6 and Studio 6 properties.

41. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. That litigation and its resolution placed the G6 Defendants on notice that staff at their branded properties were facilitating sex trafficking and that the G6 Defendants were continuing to generate revenue from properties being used for that purpose.

42. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

43. G6's hotels are routinely strategically located close to airports, freeways, and other thoroughfares making them attractive venues for trafficking and compelled prostitution.

44. Scores of news stories from across the United States highlight G6's facilitation of sex trafficking and establish that Defendants knew, or should have known, of the use of G6 branded hotels for sex trafficking. Among notable incidents involving the use of Motel and Studio 6 hotels for sex trafficking: in April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio[1]; in December 2012, the FBI investigated human trafficking at a Motel 6 in Madison, Alabama[2]; in December 2012, the Orange County Human Trafficking Task Force busted a criminal enterprise selling women for sex out of a Motel 6 in Anaheim, California[3]; in March 2015, a seventeen year old girl was rescued from a Motel 6 in North Charleston, South Carolina by Homeland Security Investigations agents and North Charleston police after being sold for sex, beaten, and starved[4]; over the approximately one-year period ending in April 2015, a Motel 6 in Warwick, Rhode Island had seventy-five arrests for crimes including sex trafficking[5]; and in June

[1] See *Toledoans Indicted on Sex Trafficking of Minors Charges*, WTOL (Nov. 8, 2010) (reporting federal indictment alleging that, in April 2009, several females occupied rooms at the Motel 6 on Heatherdowns Boulevard in Toledo, Ohio, for prostitution).

[2] See *FBI Investigates Human Trafficking at Madison Motel*, WHNT (Dec. 7, 2012) (FBI-led search warrant at the Motel 6 at 8995 Madison Boulevard, Madison, Alabama, locating a 15-year-old trafficking victim and resulting in five arrests for first-degree human trafficking).

[3] See *2 Arrested for Running Prostitution Ring Near Disneyland Motel*, CBS Los Angeles (AP) (2012) (Anaheim Police and the Orange County Human Trafficking Task Force arrested two individuals who ran a sex-for-hire operation involving several women out of the Motel 6 on Disney Way in Anaheim, California).

[4] See *Police Say Teen Starved, Beaten at North Charleston Motel; Man Arrested in Sex-Trafficking Case*, Post & Courier (Mar. 2, 2015) (Homeland Security Investigations agents and North Charleston police rescued a 17-year-old girl from the Motel 6 on Ashley Phosphate Road, where she had been held for a month and forced to engage in commercial sex).

[5] See *Police Taking Close Look at Warwick Motel 6*, WPRI (Mar. 25, 2015); City of Warwick Press Release (Apr. 7, 2015) (police responded to 79 calls and made 75 arrests at the Motel 6 on Jefferson Boulevard over the prior year, including for alleged sex trafficking).

2015, a married couple was charged with sex trafficking minor children in a case originating at a Motel 6 in Everett, Washington[6].

***IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.***

45. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

46. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on: (a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants; (b) the Defendants' collection and monitoring of customer surveys and complaints; (c) the Defendants' regular inspections of the hotel property; (d) information provided to Defendants by law enforcement; and (e) other sources of information available to Defendants.

47. By way of example, a publicly available Google review of the Subject Hotel timestamped approximately nine years prior to the filing of this Complaint — placing the review in or around 2017, contemporaneous with the period of J.A.'s trafficking at the Subject Hotel — states: "This hotel was more of a brothel then a Motel. Had someone knocking on my door at 4:30 in the morning looking for a freaking hooker. You walk outside your room and all you smell is people smoking pot. It was a disgrace." This contemporaneous review, posted publicly online by a non-victim third-party guest of the Subject Hotel, describes in plain language the open commercial sex activity at the Subject Hotel — including unsolicited, predawn solicitations by sex

[6] See *County Investigating 45 Ongoing Human Sex Trafficking Cases*, HeraldNet (June 26, 2015) (Snohomish County prosecutors charged a married couple on June 15, 2015, with promoting the commercial sexual abuse of minors, in a case originating at the Motel 6 on Evergreen Way in Everett, Washington).

buyers approaching the rooms of non-participating guests — as well as the open drug activity and brothel-like character of the Subject Hotel during the relevant period. As alleged in paragraph 80 herein, the G6 Defendants regularly monitored and analyzed guest complaints and online reviews of their branded properties, and reviews such as the foregoing were therefore available to and known by the G6 Defendants. The foregoing review and other publicly available reviews of the Subject Hotel corroborate the actual or constructive knowledge of trafficking activity at the Subject Hotel alleged herein.

48. Additional publicly available online reviews of the Subject Hotel, posted during the same approximate timeframe as the foregoing and likewise contemporaneous with or proximate to the period of J.A.'s trafficking at the Subject Hotel, similarly describe ongoing commercial sex activity, open drug activity, and law-enforcement presence at the Subject Hotel — observations that, as alleged in paragraph 80 herein, were available to the G6 Defendants through their regular monitoring of online reviews of their branded properties. For example: (a) a Google review of the Subject Hotel timestamped approximately nine years prior to the filing of this Complaint reads: "Terrible the worst hotel ever a hooker stayed next to me seedie people coming and going all hours.Had to try and sleep with lights on the roaches were so bad"; (b) a Google review of the Subject Hotel timestamped approximately eight years prior to the filing of this Complaint reads, in relevant part: "This hotel was disturbing n dirty.. there was drug dealers n hookers in the parking lot.. cops everywhere.. constantly smelled like weed.. … when you turned on the air conditioning it smelled like weed.. you went in the hotel lobby and it smelled like weed.. … do not go there unless you are a drug dealer or prostitute then you will fit right in.."; and (c) a Google review of the Subject Hotel timestamped approximately nine years prior to the filing of this Complaint reads: "To many cops they constantly patrol I was stopped for walking out of my room to my car,and

asked if I was a John for a prostitute, and when I told the staff they just shrugged it off and said they thought I was a john as well."

49. The reviews quoted in paragraphs 47 and 48 — all posted publicly online by non-victim third-party guests of the Subject Hotel during or proximate to the period of J.A.'s trafficking — describe in plain language the open commercial sex activity, open drug activity, sex-worker housing, predawn solicitations of non-participating guests by sex buyers, persistent law-enforcement presence, and brothel-like character of the Subject Hotel during the relevant period. Of particular significance, the review quoted in paragraph 48(c) records a direct admission by Subject Hotel staff that they themselves presumed an ordinary guest walking from his room to his parked car was a sex buyer (a "john") at the Subject Hotel for purposes of commercial sex — an admission documenting that commercial sex activity at the Subject Hotel was so pervasive, and so well known to Subject Hotel staff, that even routine guest movements were presumed by staff to involve sex buying. This staff-level acknowledgment, together with the surrounding observations of drug dealers, sex workers, predawn solicitations, and constant law-enforcement presence on the Subject Hotel premises, constitutes direct evidence of the actual knowledge of Franchisee Defendant's staff regarding commercial sex activity and trafficking-indicative conduct at the Subject Hotel. Such knowledge, acquired in the course and scope of employment, is imputed to Franchisee Defendant and, derivatively, to the G6 Defendants.

***V. Defendants knew J.A. was being trafficked at the Subject Hotel because of the apparent and obvious "red flags" of sex trafficking.***

50. During the period that J.A. was trafficked at the Subject Hotel, there were signs obvious to Defendants that Plaintiff's trafficker was engaged in sex trafficking on the subject premises:

(a) A steady procession of sex buyers to and from the rented rooms used to traffic J.A., observable by hotel staff and other guests;

(b) J.A. was visibly impaired by heroin use throughout the period of her trafficking, including but not limited to obvious signs of intoxication, withdrawal, malnutrition, fatigue, poor hygiene, and impaired behavior, all of which were apparent to hotel staff during their regular interactions with her;

(c) Visible marks on J.A.'s body consistent with intravenous drug use, which — in combination with the trafficker's controlling conduct, the steady stream of sex buyers, and the other red flags described herein — were indicators not merely of substance abuse but of trafficker-imposed chemical dependency, coercion, and commercial sexual exploitation;

(d) J.A. would, at times, walk around hotel grounds drug impaired, sleep deprived, hygiene impaired, and behavior impaired, in conditions consistent with being a victim of sex trafficking;

(e) J.A. would interact, at times, with Defendants' staff while obviously drug impaired, sleep deprived, hygiene impaired, and behavior impaired;

(f) Inside the hotel rooms used for J.A.'s trafficking, there were suspicious items including heroin, syringes and other drug paraphernalia, and large quantities of condoms, which were observed by housekeeping staff during the course and scope of their employment, or should have been so observed;

(g) J.A.'s rooms exhibited signs of commercial sex work and contemporaneous intravenous drug use;

(h) J.A.'s trafficker verbally abused J.A. in plain view and hearing of hotel staff and guests, including in common areas of the Subject Hotel;

(i) J.A.'s trafficker physically abused J.A.;

(j) Housekeeping staff at the Subject Hotel observed or should have observed heroin, used and unused syringes, other drug paraphernalia, and condoms inside the rooms used for J.A.'s trafficking;

(k) J.A. was advertised for commercial sex on the known trafficking-advertisement platforms identified above (SkipTheGames and Megapersonal);

(l) Upon information and belief, other female victims of sex trafficking were exploited at the Subject Hotel at times during the relevant period, contributing to a pattern of ongoing commercial sex trafficking activity that was apparent or should have been apparent to Defendants' staff and management; and

(m) Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

51. Defendants' staff witnessed and observed on a regular and frequent basis signs and indicators of sex trafficking including items set forth in the preceding paragraph.

52. J.A. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to J.A. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee-restricted area.

53. Upon information and belief, multiple staff at the Subject Hotel, including management-level employees and housekeeping staff, personally observed the heroin use, drug

paraphernalia, condoms, commercial sex activity, and related indicators of sex trafficking inside the rooms used to traffic J.A., within the course and scope of their employment with Franchisee Defendant. Their knowledge of those indicators is therefore imputed to Franchisee Defendant and, derivatively, to the G6 Defendants.

54. As such, Defendants knew or should have known that J.A. was being trafficked at the Subject Hotel.

55. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control — including J.A.'s visible and continuous impairment from trafficker-supplied heroin, the visible physical signs of intravenous drug use on her body, her trafficker's verbally and physically abusive conduct toward her, the trafficker's practice of requiring that the rooms used to traffic her be rented in J.A.'s name at his direction, and the online advertisement of J.A. for commercial sex through known trafficking platforms. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that J.A. was being subjected to trafficking through force, fraud, and coercion.

***VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of J.A.***

56. Defendants had both actual and constructive knowledge of the trafficking of J.A. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

57. Rooms used for the trafficking of Plaintiff at Defendants' subject hotel during the relevant time period were rented by her trafficker or at the direction of her trafficker, and the

trafficker also caused the rooms to be paid for through means under his control. The rental of those rooms to facilitate sex trafficking continued despite the obvious indicators of trafficking described above, including the heroin paraphernalia, condoms, drug-impaired condition of J.A., procession of sex buyers, and other red flags observed by hotel staff.

58. Defendants rented rooms to individuals — including J.A.'s trafficker, or others acting at his direction — whom they knew or should have known were engaged in or being used for sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

59. Franchisee Defendant, through its staff, rented rooms to be used for the trafficking of J.A., collected payment for those rooms, and interacted face-to-face with J.A. on a regular and repeated basis. These were not passive observations of trafficking from a distance; Franchisee Defendant was directly involved in the commercial transactions that provided J.A.'s trafficker with the venue used to sexually exploit J.A.

60. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in approximately 2017.

61. Discovery will inform whether the rooms used at the subject hotel for the sex trafficking of the Plaintiff in violation of the TVPRA were rented by the trafficker, or by others at the direction of the trafficker, and were booked: (a) under the renter's proper legal name, an alias, or otherwise; (b) using cash, prepaid card, debit card, or credit card at the time of respective booking or renewal; and (c) whether staff of Defendants required for each booking that the renter show identification.

62. Plaintiff's trafficker used proceeds derived from the sex trafficking occurring on the subject premises to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

63. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

64. Franchisee Defendant knew or should have known that J.A. was being trafficked and, despite this, benefited from continued association with her trafficker by providing him and her a venue in the form of hotel rooms and related services, to facilitate J.A.'s sexual exploitation.

65. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of J.A., in ways including: (a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking; (b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff; (c) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; (d) tolerating, failing to detect, and failing to prevent staff from ignoring or concealing observed trafficking activity in guest rooms; and (e) creating an environment where traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

66. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued renting rooms used to sexually exploit victims, including J.A.

67. G6 knew or should have known that J.A. was being trafficked and, despite this, benefited from continued association with her trafficker by providing hotel rooms and related services to facilitate J.A.'s sexual exploitation.

68. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following: (a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking; (b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training; (c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties; (d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately; (e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel; (f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal; (g) the G6 Defendants allowed traffickers to reserve rooms using cash and to direct victims to register rooms in the victims' own names, which provided relative anonymity and non-traceability for traffickers; and (h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting

commercial sex services online, including through known trafficking advertisement platforms such as SkipTheGames and Megapersonal.

69. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of J.A. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of J.A.

### *VII. Defendants' ventures at the Subject Hotel.*

70. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the Subject Hotel, including J.A.'s trafficker.

71. Plaintiff's trafficker operated his sex trafficking business out of Defendants' subject hotel during the relevant period in approximately 2017, including by repeatedly using rooms at the Subject Hotel. This repeated pattern evidences a continuous business relationship between the trafficker and the Subject Hotel.

72. Franchisee Defendant's repeated rental of rooms used to traffic Plaintiff at Defendants' hotel was not a standard arm's length transaction, but rather involved repeated room rental and re-rental transactions which occurred during the time that Plaintiff was trafficked at the subject hotel, colored by overt indicators of sex trafficking, such that said Defendant knew, or should have known, that Defendant was providing the venue for sex trafficking, and of Plaintiff in particular, in violation of the TVPRA. This continuous business relationship gives rise to the inference of a tacit agreement between Franchisee Defendant and J.A.'s trafficker to continue their mutually beneficial commercial dealings despite Franchisee Defendant's actual or constructive knowledge that the trafficker was engaged in sex trafficking.

73. Franchisee Defendant's association with the Plaintiff's sex trafficker was a venture because Plaintiff's trafficker had ongoing commercial dealings with said Defendant at the subject hotel premises by means of rooms repeatedly used by the trafficker (rented by the trafficker, or at the trafficker's direction) during the time period of Plaintiff's trafficking, which said Defendant knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

74. Franchisee Defendant and Franchisor Defendants were each engaged in a venture with Plaintiff's trafficker through their respective staff.

75. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and Franchisor Defendants and their respective agents, employees and staff, and Plaintiff's trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the Plaintiff's trafficker by repeatedly providing rooms used for sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the venture's success.

76. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

***VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.***

77. The G6 Defendants maintained "boots on the ground" at the Subject Hotel. Through the systems, personnel, policies, and operational controls described in this section, the G6 Defendants' participation in the operation of Motel 6 Raleigh was not the passive licensing of a brand but active, ongoing, and systemic control of the means and methods of day-to-day operations. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Hotel, which are G6's actual agents or subagents.

78. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

79. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant: (a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel; (b) covered virtually all aspects of hotel operations, including internal operating functions; (c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and (d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

80. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-

day operation of the Subject Hotel, including: (a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations; (b) controlling training content and methods for hotel staff; (c) designating approved vendors and prohibiting purchases from non-approved sources; (d) requiring use of specific technology, hardware, software, and property management systems; (e) setting required staffing levels; (f) establishing detailed job descriptions and dictating which positions must perform which tasks; (g) setting requirements for hiring, overseeing discipline, and termination decisions; (h) controlling channels for guest complaints and directly participating in responses; (i) generating reports and analysis of guest complaints and online reviews; (j) requiring use of a Guest Relations Application owned and operated by G6; (k) regularly auditing books and records; (l) conducting frequent and unscheduled inspections; (m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements; (n) controlling all marketing and prohibiting unauthorized online presence; and (o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

81. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including: (a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties; (b) retaining control over when branded hotels would share information with law enforcement; (c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated; (d) retaining control over determining which hotels needed additional training based on high risk of trafficking; (e) retaining control to terminate staff or franchising agreements based on the response to human trafficking; (f) retaining control over all training on how to spot and prevent human

trafficking; (g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents; (h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking; (i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible; and (j) retaining control over housekeeping policies, including how often rooms must be entered and how to respond to guest refusals of entry.

82. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things: (a) controlling the guest reservation, check-in, payment, and identity-verification processes, including the policies and procedures governing them; (b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval; (c) establishing and maintaining a brand-wide "do not rent" system; (d) controlling room rates, required discounts, mandatory fees, and rewards programs; (e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation; and (f) collecting, retaining, monitoring, and analyzing detailed data about every guest.

### *IX. G6 Defendants are jointly responsible for the trafficking of J.A.*

83. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

84. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

### *X. Defendants are Jointly and Severally Liable for J.A.'s Damages.*

85. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to J.A.

86. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to J.A. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA

87. J.A. incorporates by reference the allegations set forth in paragraphs 1 through 86 above as though fully set forth herein.

### *A. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)*

88. J.A. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. § 1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

89. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including J.A.'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including J.A.'s trafficker, were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

90. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant

regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

91. Violations of 18 U.S.C. § 1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause J.A. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

***B. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)***

92. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

93. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

94. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

95. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

96. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

## DAMAGES

97. Defendants' acts and omissions, individually and collectively, caused J.A. to sustain legal damages.

98. Defendants are jointly and severally liable for all past and future damages sustained by J.A.

99. Defendants' involvement and failure, by their respective agents, servants, staff, and employees, to prevent or timely intervene in the sex trafficking was a proximate cause and substantial factor in J.A.'s severe injuries, including the trauma of being induced to engage in commercial sex while trafficked and in fear of withdrawal, physical harm, and abandonment; trafficker-imposed chemical dependency on heroin; verbal and physical abuse; and online advertisement for commercial sex, as well as residual injuries including post-traumatic stress disorder (PTSD), depression, anxiety, and substance use disorder.

100. As a direct and proximate result of Defendants' involvement, enabling, and multiple failures to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, J.A. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel in violation of the TVPRA.

101. J.A. is entitled to be compensated for personal injuries and economic damages, including: (a) Actual damages (until trial and in the future); (b) Incidental and consequential damages (until trial and in the future); (c) Mental anguish and emotional distress damages (until trial and in the future); (d) Lost earnings and lost earning capacity (until trial and in the future); (e) Necessary medical expenses (until trial and in the future); (f) Life care expenses (until trial and in the future); (g) Physical pain and suffering (until trial and in the future); (h) Physical impairment (until trial and in the future); (i) Exemplary/Punitive damages; (j) Attorneys' fees; (k) Costs of this action; and (l) Pre-judgment and all other interest recoverable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Reasonable and recoverable attorney's fees;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which J.A. may, in law or in equity, show herself to be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: May 27, 2026

Respectfully submitted,

/s/ Michael Gallagher, Esq.
Michael M. Gallagher
MORGAN & MORGAN
16255 Park Ten Pl
Houston, TX 77084
Telephone: (689) 219-2333
Facsimile: (689) 219-2363
michaelgallagher@forthepeople.com

Randolph Janis, Esq.
*Pro hac vice* forthcoming
DOUGLAS AND LONDON, P.C.
1 State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
*Pro hac vice* forthcoming
DOUGLAS AND LONDON, P.C.
1 State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com